IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

J. WATKINS,

        Plaintiff,

                                    3:11-CV-501-PK

v.                                           OPINION AND ORDER

THE ARCHDIOCESE OF PORTLAND IN OREGON and THE ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON,

        Defendant.

PAPAK, Magistrate Judge:

      Plaintiff J. Watkins filed this action against defendants The Archdiocese of Portland in Oregon (the "Archdiocese") and The Roman Catholic Archbishop of Portland in Oregon (the "Archbishop") on April 22, 2011. Watkins amended his complaint effective July 5, 2011. Watkins alleges defendants' vicarious liability for the sexual battery of a child on a theory of *respondeat superior*, arising out of sexual touching that Watkins suffered during his minority between 1965 and 1969 at the hands of two priests employed by the defendants (Fathers Laughlin and Durand). This court has jurisdiction over Watkins' action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case arising under Title 11 of the United States

Page 1 - OPINION AND ORDER

Code.[1]

Now before the court are defendants' motion (#33) for summary judgment (by and through which defendants argue that Watkins' claims are time-barred), defendants' motion (#38) for judicial notice, plaintiff's motion (#50) to re-open discovery, and plaintiff's motion (#51) for leave of court to disclose a supplemental expert witness opinion. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, defendants' motion (#33) for summary judgment is granted, defendants' motion (#38) for judicial notice is granted, and, in light of my disposition of defendants' dispositive motion, plaintiff's motion (#50) to re-open discovery and motion (#51) for leave of court to disclose a supplemental expert witness opinion are each denied as moot.

## LEGAL STANDARDS

**I.      Judicial Notice**

Federal Rule of Evidence 201(d) provides that "[a] court shall take judicial notice [of an adjudicative fact] if requested by a party and supplied with the necessary information." An adjudicative fact is subject to judicial notice when the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b).

---

[1] Specifically, this action is subject to the future claims fund under the Third Amended and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to pay all claims made against the Archdiocese through 2023.

Page 2 - OPINION AND ORDER

## II. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND[2]

### I. History of the Parties' Dispute

Watkins was born in 1955, and attended fifth through eighth grades at St. Mary Parish and School in Corvallis, Oregon, from 1965 through 1969. During that time, Fathers Thomas Laughlin and Donald Durand were ordained priests of the Archdiocese assigned by the defendants to serve at St. Mary. Watkins alleges that, during his time at St. Mary:

> Father Durand and Father Laughlin acted as youth pastor, priest, confessor, role model, and friend to the Plaintiff. They sought and gained the respect, trust, and obedience of the Plaintiff and his parents. By virtue of this relationship, over

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

Page 3 - OPINION AND ORDER

>time, Father Durand and Father Laughlin gained the support, permission, and
>acquiescence of the Plaintiff's parents to spend time with the Plaintiff, to spend
>time alone with the Plaintiff, to spend substantial periods of time with the
>Plaintiff, to develop and maintain a social relationship with the Plaintiff and to
>become a surrogate father and role model for the Plaintiff.  Father Durand and
>Father Laughlin eventually won the respect, loyalty, and obedience of the Plaintiff
>while simultaneously acting in the interest of their employers and employment.
>Father Durand and Father Laughlin used their positions of trust to have innocent
>physical contact with the Plaintiff from time to time.  Fr. Durand became a
>predominant authority figure and male role model in the Plaintiff's life, holding
>and exercising the power of authorship of the Plaintiff's attitudes, thinking,
>beliefs, and behavior.  At all material times, Father Durand and Father Laughlin
>were acting, at least initially and partially, for the benefit of the Defendants,
>within the time and space parameters and within the course and scope of their
>employment.

First Amended Complaint, ¶ 7.

Watkins alleges that during his time at St. Mary Fr. Laughlin subjected him on multiple occasions to unwelcome touching, including unwanted hugs, kisses, and touching in intimate areas.

Watkins further alleges that when he was in the seventh or eighth grade, Fr. Durand required him to strip from the waist down and to bend over and submit to being struck on the buttocks by Durand with a wooden paddle, as a form of discipline.  He further alleges that while he was in the eighth grade, Fr. Durand took him and other boys on a weekend trip to a cabin near Detroit Lake in Oregon, and that during the drive up to the cabin Durand directed him to sit on Durand's lap and steer the car from that position, in which posture Watkins could feel Durand's erection pressing against him.  Watkins further alleges that during the cabin weekend Durand required him to wrestle with Durand and other boys in various states of undress, to take nude saunas with Durand, to take showers out of doors within Durand's view, to submit to the forcible removal of his clothing, to submit while snow was rubbed on his genitals by Durand or by other

Page 4 - OPINION AND ORDER

boys, and to swim naked in a river in Durand's company.

## II. Watkins' Purported Discovery that the Complained-of Conduct Constituted Sexual Abuse

Watkins testified in deposition to having experienced strong feelings of aversion during and after the complained-of actions described above, to feeling "very violated and angry" over the sexual touching, and to have actively resisted most of the conduct while it was taking place. Immediately after the cabin weekend with Fr. Durand, Watkins attempted to speak with other affected boys about what had happened, because (according to Watkins' non-contemporaneous report to his psychologist) he "knew Durand had done something wrong," and was shocked to discover that the other boys did not even want to discuss it. He similarly attempted to tell his mother about the cabin incident, but she was unwilling or unable to hear what he was trying to tell her, causing him to feel betrayed and let down.

In or around 1975, after Watkins had attained his majority (and approximately six years after Fr. Durand's unwelcome conduct described above), Watkins saw Fr. Durand naked in a sauna, and reacted to the sight as though he had been shot with a "bullet to the gut." Watkins testifies that, at that time, he feared Durand because of "the experiences [he'd] had with him at the cabin."

In or around 1983, or approximately contemporaneously with the event, Watkins learned that Laughlin had been convicted of sexually abusing children in his care. Watkins later reported to his psychologist that at the time he learned of Fr. Laughlin's conviction, he told his mother he was surprised that it had been Laughlin, but "wouldn't have been surprised" had it been Fr. Durand who had been convicted. Watkins also reported to his psychologist that reading about

sexual abuse allegations against the Catholic Church in the newspapers would trigger strong emotional responses.

Watkins concedes that throughout the 2000s he was aware of sex abuse claims being made against priests of the Archdiocese.

In approximately July 2005, Watkins' friend G.W., at the time a sex-abuse claimant against the defendants, contacted Watkins to inquire whether Watkins would consent to speak to G.W.'s attorney (formerly Watkins' counsel in this action) regarding the cabin weekend with Durand. Watkins agreed to do so, and did do so. Watkins subsequently reported to his psychologist that the call had "blown him away" and that his initial verbal respnse was "Finallly!" Watkins understood that G.W. was making sex abuse claims against the Archdiocese, that his claims rested in part on the same cabin weekend with Fr. Durand at which Watkins had been present, and that it was G.W.'s theory that he was entitled to money damages because he had suffered injury in consequence of what had occurred at the cabin.

It is Watkins' position that beginning in his early teenage years he repressed all memory of the alleged sexual abuse, and that he was unable to recall the unwelcome sexual touching or to understand that it had been sexually abusive until some time in 2006. Watkins does not provide evidence that any particular event or information either suddenly or gradually made it possible for him to understand that he had suffered sexual abuse. Instead, Watkins takes the position that his memory simply returned to him gradually, in "snippets," begin some time after he spoke to G.W.'s attorney.

## ANALYSIS

I.   **Defendants' Motion (#38) for Judicial Notice**

By and through their motion for judicial notice, defendants request that the court take judicial notice of the following:

- In June 1983, the State of Oregon, through the Multnomah County Circuit Court, entered guilty pleas for Thomas B. Laughlin on two counts of child sexual abuse.

- On June 25, 1983, *The Oregonian* reported that Fr. Thomas B. Laughlin pleaded guilty to two charges of second degree sex abuse resulting from sexual contact with two boys in 1980.

- In August 1983, the State of Oregon, through the Multnomah County Circuit Court, entered judgment convicting Thomas B. Laughlin of two counts of child sexual abuse.

- On August 30, 1983, *The Oregonian* reported that "[a] Catholic priest was sentenced . . . to one year in Multnomah County jail after pleading guilty to two misdemeanor charges of sexual abuse involving boys under the age of 18."

- On August 31, 1983, *The Oregonian* published two similar reports.

I agree with the defendants that these are fit matters for judicial notice. *See* Fed. R. Evid. 201(b). Defendants' motion for judicial notice is therefore granted, and the court takes notice of the subject adjudicative facts.

II.   **Defendants' Motion (#33) for Summary Judgment**

As noted above, the gravamen of defendant's summary judgment motion is that Watkins' claims are time-barred. There are two discrete and independent metrics for determining the

Page 7 - OPINION AND ORDER

timeliness of Watkins' claims, namely, the applicable statute of limitations, and the so-called "claims bar date" set by a January 2005 order of the Bankruptcy Court for the District of Oregon.

Oregon statutory law provides a two-year limitations period generally applicable to claims sounding in tort. *See* Or. Rev. Stat. 12.110. Under Or. Rev. Stat. 12.160, however, actions accruing while a plaintiff is a minor may be filed up to one year after the plaintiff attains majority. *See* Or. Rev. Stat. 12.160. Moreover, under Or. Rev. Stat. 12.117, actions based on conduct constituting child abuse may be brought at any time before the victim of child abuse reaches the age of forty, or, in the event the victim has not by that time discovered the causal link between the abuse and any injury suffered as a result, and in the exercise of reasonable care could not have been expected to discover such link, within five years after the date the victim either discovered or reasonably should have discovered the causal link. *See* Or. Rev. Stat. 12.117(1).[3]

For purposes of Section 117, the term "child abuse" is defined as:

    (a)    Intentional conduct by an adult that results in:

        (A)    Any physical injury to a child; or

        (B)    Any mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child;

    (b)    Rape of a child, which includes but is not limited to rape, sodomy, unlawful sexual penetration and incest, as those acts are defined in ORS chapter 163;

    (c)    Sexual abuse, as defined in ORS chapter 163, when the victim is a child;

---

[3] Effective January 1, 2010, Or. Rev. Stat. 12.117 was amended to provide a five-year rather than three-year period for bringing suit after discovery of an injury or a causal connection between a defendant's conduct and an injury. This amendment is retroactively applicable, except as to cases that reached judgment prior to January 1, 2010. *See* Or. Rev. Stat. 879.002.

Page 8 - OPINION AND ORDER

>   or
>
> (d) Sexual exploitation of a child, including but not limited to:
>
>   (A) Conduct constituting violation of ORS 163.435 and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact; and
>
>   (B) Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167.

Or. Rev. Stat. 12.117(2). The Oregon Court of Appeals has expressly held that Section 117 may properly be applied to torts of negligence (one of which is at issue here), stating that "the statute clearly does apply to negligence claims, but only [to] those involving 'knowingly allowing, permitting or encouraging child abuse.'" *Lourim v. Swensen* [("*Lourim I*")], 147 Or. App. 425, 439 (1997). The *Lourim I* court further specified that actual as opposed to constructive knowledge that such child abuse was taking place is required for the extended limitations period to apply. *Id.* at 444.

The Oregon Supreme Court has provided the following guidance for courts seeking to apply the discovery rule in connection with statute of limitations analysis:

> To discover a particular element of legally cognizable harm, the plaintiff does not need to know to certainty that each particular element exists. The discovery rule is designed to give plaintiffs a reasonable opportunity to become aware of their claim. Actual knowledge that each element is present is not required. On the other hand, a mere suspicion is insufficient to begin the statute of limitations to run. We believe that a quantum of awareness between the two extremes is contemplated by the statute. Therefore, **the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the . . . elements [of a cause of action] exists**.

Page 9 - OPINION AND ORDER

> We emphasize that this is an objective test. In most cases, the inquiry will concern what a plaintiff should have known in the exercise of reasonable care. In such cases, the relevant inquiry is how a reasonable person of ordinary prudence would have acted in the same or similar situation. **Relevant to this analysis will be a plaintiff's failure to make a further inquiry if a reasonable person would have done so. The discovery rule does not protect those who sleep on their rights, but only those who, in exercising the diligence expected of a reasonable person, are unaware that they have suffered legally cognizable harm.**

*Gaston v. Parsons*, 318 Or. 247, 255-256 (1994) (emphasis supplied). The *Gaston* court went on to note that the reasonableness inquiry can be impacted by, *e.g.*, representations made by the tortfeasor on which the plaintiff might reasonably rely, or by side effects of the tortious conduct that might act to "mask" the harm the plaintiff suffered. *See id.* at 256-257.

The question of when a person in the exercise of reasonable care should have discovered an injury or the causal connection between an injury and a tortfeasor's conduct is generally a question of fact for a jury to decide. In *Minisce v. Thompson*, 149 Or. App. 746 (1997), the Oregon Court of Appeals held that the question of "whether [the injury] should have sufficiently alerted plaintiff to trigger discovery . . . is a quintessential jury question." *Minisce*, 149 Or. App. at 752. In *Hoeck v. Schwabe Williamson & Wyatt*, 149 Or. App. 607 (1997), the court held that "precisely when a person reasonably should have known that the harm suffered was caused by another's negligence generally presents a question of fact." *Hoeck*, 149 Or. App. at 612. Nevertheless, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," because under those circumstances "there is no 'genuine issue for trial'." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Watkins attained the age of 40 in 1995. This action was filed April 22, 2011. Thus,

Page 10 - OPINION AND ORDER

Watkins' claim was timely filed under Oregon's applicable statute of limitations only if, in the exercise of reasonable care, Watkins could not have been expected to discover the causal link between the abuse he suffered and any consequential injury at any time prior to April 22, 2006.

A separate analysis is required in connection with the claims bar date ordered by the bankruptcy court. Federal Rule of Bankruptcy Procedure 3003(c)(3) provides that the bankruptcy court "shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed." Fed. R. Bankr. Pro. 3003(c)(3). Pursuant to Rule 3003(c)(3), in January 2005 the Bankruptcy Court for the District of Oregon issued an order fixing a "claims bar date" of April 29, 2005, for "existing claims" against the Archdiocese or Archbishop, stating that such a date was "necessary for the prompt and efficient administration of the [Archdiocese's] Chapter 11 case and to protect the interests of the [Archdiocese], its creditors and other parties in interest[.]"

Pursuant to the bankruptcy court's order, any individual with an *accrued* claim against the Archdiocese was required to file a proof of claim by April 29, 2005. *See* Fed. R. Bankr. Pro. 3003(c)(2) ("Any creditor . . . whose claim . . . is not scheduled . . . shall file a proof of claim within the time prescribed by subdivision (c)(3). . . ."). The Archdiocese's Joint Plan of bankruptcy established that the Archdiocese was "discharged from all liability" on claims and debts arising before the effective date of the Archdiocese's reorganization if not filed before the claims bar date. "The granting of a discharge operates as a permanent injunction against any attempt to collect or recover on a prepetition debt." *Irizarry v. Schmidt (In re Irizarry)*, 171 B.R. 874, 878 (B.A.P. 9th Cir. 1994); *see also* Bankr. C. § 524(a).

The bankruptcy court's order incorporated the language of the discovery rule incorporated by Or. Rev. Stat. 12.117(1) into the definition of "future claimants," whose claims would not be

Page 11 - OPINION AND ORDER

barred if not filed prior to the claims bar date:

> The only [future] claimants [or claimants whose claims would not be barred if brought after the claims bar date of April 29, 3005] are (1) minors; (2) those with repressed memory; and (3) those persons who know they were subjected to sexual contact as children but who have "not discovered the [resulting] injury or the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the injury or the causal connection between the injury and the child abuse[.]"  O.R.S. 12.117(1).

*In re Roman Catholic Archbishop*, Case No. 04-37154-elp11, 2005 Bankr. LEXIS 42 (Bankr. D. Or. Jan. 10, 2005) (third modification original).  Thus, Watkins' claim was timely filed for purposes of the bankruptcy court's claims bar date only if, in the exercise of reasonable care, Watkins could not have been expected to discover the causal link between the abuse he suffered and any consequential injury at any time prior to April 29, 2005.

Defendants urge the court to find that Watkins had actual knowledge both of the sexual abuse he suffered and that the abuse was harmful at all material times since the abuse occurred. In support, defendants point to evidence, discussed above, that Watkins' own testimony establishes that he had contemporaneous awareness that something "wrong" had occurred over the course of the weekend at the cabin with Fr. Durand.

In the alternative, defendants argue that, even if Watkins repressed all memory of the sexual abuse prior to reaching his majority, he was put on inquiry notice of the possibility that he had been harmed by sex abuse at the hands of Frs. Laughlin and Durand each time he read in the newspaper about sex abuse charges being filed against the Archdiocese or about Laughlin's conviction during the early 1980's.  Finally, defendants argue that, by not later than July 2005, when he spoke with G.W.'s attorney about serving as a witness to events taking place during the cabin weekend with Fr. Durand in connection with G.W.'s sex abuse claim against the

Archdiocese, a reasonable person would necessarily have been placed on inquiry notice as to whether he, too, might have a similar claim arising out of those same events.

I am unpersuaded by defendants' argument that, as a matter of law, Watkins has had actual knowledge of the sexual abuse and its harmfulness since it occurred. Watkins has provided competent testimony that he repressed all memory of the sexual abuse and of its harmfulness prior to 2006, and for purposes of defendants' motion I resolve all disputes regarding the accuracy of Watkins' testimony in Watkins' favor. For the same reason, I am unpersuaded that Watkins' contemporaneous knowledge of Fr. Laughlin's conviction and of sexual abuse claims reported in the newspaper during the 1980's was sufficient as a matter of law to establish that Watkins should have been aware of the substantial possibility that he had a potential claim against the defendants. Watkins has testified that memory of the abuse and its harmfulness was not triggered by any of the potential catalysts taking place in the 1980's.

However, I agree with defendants that, notwithstanding the claimed repression of Watkins' memory, Watkins was placed on inquiry notice of his potential claims against the defendants by not later than July 2005. At that time, Watkins was contacted by his friend G.W., then a sex-abuse claimant against the defendants, who asked if Watkins would be willing to speak to G.W.'s attorney regarding events taking place during the cabin weekend with Durand. Watkins agreed to and did speak to G.W.'s attorney, who subsequently served as the attorney representing Watkins at the time this action was filed.

At the time Watkins spoke with G.W.'s attorney, he was necessarily placed on notice that G.W. was pursuing sex abuse claims against the defendants arising out of events to which Watkins had been both a witness and a victim, much as G.W. had been. Notwithstanding any

Page 13 - OPINION AND ORDER

suppression of memory, Watkins' knowledge that sex abuse claims might lie against the defendants based on conduct of which he had at least potentially been a victim must necessarily have placed him on inquiry notice regarding the possibility that he, too, might have similar claims. In consequence, as a matter of Oregon law Watkins' claims against the defendants became time-barred by not later than July 2010. As noted above, Watkins filed this action in April 2011, some nine months after the applicable limitations period had closed.

Because a reasonable person would have been on inquiry notice of the substantial possibility that sexual abuse claims might lie against the defendants by not later than July 2005, Watkins' claim is time-barred under the applicable statute of limitations. Defendants' motion (#33) for summary judgment is therefore granted.

### III.    Plaintiff's Motion (#50) to Re-Open Discovery and Motion (#51) for Leave to Supplement Expert Witness Disclosure

In light of the foregoing disposition of defendants' dispositive motion, Watkins' motion to re-open discovery and motion for leave to supplement his expert witness disclosure are denied as moot.

### CONCLUSION

For the reasons set forth above, defendants' motion (#33) for summary judgment is granted, defendants' motion (#38) for judicial notice is granted, plaintiff's motion (#50) to

/ / /

/ / /

/ / /

/ / /

re-open discovery is denied as moot, and plaintiff's motion (#51) for leave of court to disclose a supplemental expert witness opinion is denied as moot. A final judgment should be prepared.

Dated this 19th day of November, 2012.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge