IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

J. WATKINS,

       Plaintiff,

                                3:11-CV-501-PK

v.                                    OPINION AND
                                    ORDER

THE ARCHDIOCESE OF PORTLAND IN
OREGON and THE ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN
OREGON,

       Defendant.

PAPAK, Magistrate Judge:

Plaintiff J. Watkins filed this action against defendants The Archdiocese of Portland in Oregon (the "Archdiocese") and The Roman Catholic Archbishop of Portland in Oregon (the "Archbishop") on April 22, 2011. Watkins amended his complaint effective July 5, 2011. Watkins alleges defendants' vicarious liability for the sexual battery of a child on a theory of *respondeat superior*, arising out of sexual touching that Watkins suffered during his minority between 1965 and 1969 at the hands of two priests employed by the defendants. This court has jurisdiction over Watkins' action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case arising under Title 11 of the United States Code.[1]

---

[1] Specifically, this action is subject to the future claims fund under the Third Amended and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of*

On November 19, 2012, I issued an Opinion and Order (#74) granting summary judgment

in favor of the defendants and, *inter alia*, denying as moot Watkins' pending motions to re-open

discovery and for leave of court for untimely disclosure of a purportedly supplemental expert

witness opinion. Now before the court is Watkins' motion (#86) for reconsideration of the issues

disposed of by and through that order. I have considered the motions, oral argument on behalf of

the parties, and all of the pleadings and papers on file. For the reasons set forth below, Watkins'

motion is granted in part and denied in part as discussed below, and final judgment (#75) in this

matter dismissing Watkins' claim with prejudice is affirmed.

## LEGAL STANDARDS

"A district court may reconsider its grant of summary judgment under either Federal Rule

of Civil Procedure 59(e) (motion to alter or amend a judgment) or Rule 60(b) (relief from

judgment)." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993). "Under either

theory [the Ninth Circuit's] review of a denial of a motion to reconsider is for abuse of

discretion." *Id., citing Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1441 (9th Cir. 1991).

## I.    Amendment of Judgment Under Rule 59(e)

Federal Civil Procedure Rule 59(e) provides statutory authority for the district courts to

consider a party's motion to alter or amend a judgment. *See* Fed. R. Civ. P. 59(e). Such a motion

may appropriately be granted where "the district court (1) is presented with newly discovered

evidence [or] (2) committed clear error or the initial decision was manifestly unjust, or (3)

[where] there is an intervening change in controlling law." *Id.* at 1263. However, "[t]here may

---

*Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to
pay all claims made against the Archdiocese through 2023.

also be other, highly unusual, circumstances warranting reconsideration in addition to the foregoing." *Id.*

## II.    Relief From Final Judgment Under Rule 60(b)

Federal Civil Procedure Rule 60(b) provides, in relevant part, as follows:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1)    mistake, inadvertence, surprise, or excusable neglect;
>
> * * *; or
>
> (6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b). "Rule 60(b) 'provides for reconsideration only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) "extraordinary circumstances" which would justify relief.'" *Sch. Dist. No. 1J*, 5 F.3d at 1263, *quoting Fuller*, 950 F.2d at 1442.

## FACTUAL BACKGROUND

## I.    History of the Parties' Dispute[2]

Watkins was born in 1955, and attended fifth through eighth grades at St. Mary Parish and School in Corvallis, Oregon, from 1965 through 1969. During that time, Fathers Thomas Laughlin and Donald Durand were ordained priests of the Archdiocese assigned by the defendants to serve at St. Mary. Watkins alleges that, during his time at St. Mary:

> Father Durand and Father Laughlin acted as youth pastor, priest, confessor, role model, and friend to the Plaintiff. They sought and gained the respect, trust, and obedience of the Plaintiff and his parents. By virtue of this relationship, over

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in the light most favorable to plaintiff Watkins.

Page 3 - OPINION AND ORDER

time, Father Durand and Father Laughlin gained the support, permission, and acquiescence of the Plaintiff's parents to spend time with the Plaintiff, to spend time alone with the Plaintiff, to spend substantial periods of time with the Plaintiff, to develop and maintain a social relationship with the Plaintiff and to become a surrogate father and role model for the Plaintiff. Father Durand and Father Laughlin eventually won the respect, loyalty, and obedience of the Plaintiff while simultaneously acting in the interest of their employers and employment. Father Durand and Father Laughlin used their positions of trust to have innocent physical contact with the Plaintiff from time to time. Fr. Durand became a predominant authority figure and male role model in the Plaintiff's life, holding and exercising the power of authorship of the Plaintiff's attitudes, thinking, beliefs, and behavior. At all material times, Father Durand and Father Laughlin were acting, at least initially and partially, for the benefit of the Defendants, within the time and space parameters and within the course and scope of their employment.

First Amended Complaint, ¶ 7.

During the time Watkins attended school at St. Mary, Fr. Laughlin subjected him on multiple occasions to unwelcome touching, including unwanted hugs, kisses, and touching in intimate areas.

When Watkins was in the seventh or eighth grade Fr. Durand required him to strip from the waist down and to bend over and submit to being struck on the buttocks by Durand with a wooden paddle, as a form of discipline. When Watkins was in the eighth grade, in or around 1969, Fr. Durand took him and other boys on a weekend trip to a cabin near Detroit Lake in Oregon. During the drive up to the cabin, Durand directed Watkins to sit on Durand's lap and to steer the car from that position, in which posture Watkins could feel Durand's erection pressing against him. Over the course of the cabin weekend, Durand required Watkins to wrestle with Durand and other boys in various states of undress, to take nude saunas with Durand, to take showers out of doors within Durand's view, to submit to the forcible removal of his clothing, to submit while snow was rubbed on his genitals by Durand or by other boys, and to swim naked in

Page 4 - OPINION AND ORDER

a river in Durand's company.

## II.    Watkins' Purported Discovery that the Complained-of Conduct Constituted Sexual Abuse

Watkins testified in deposition to having experienced strong feelings of aversion during and after the complained-of actions described above, to feeling "very violated and angry" over the sexual touching, and to have actively resisted most of the conduct while it was taking place. Immediately after the cabin weekend with Fr. Durand, Watkins attempted to speak with other affected boys about what had happened, because (according to Watkins' non-contemporaneous report to his psychologist) he "knew Durand had done something wrong," and was shocked to discover that the other boys did not even want to discuss it. He similarly attempted to tell his mother about the cabin incident, but she was unwilling or unable to hear what he was trying to tell her, causing him to feel betrayed and let down.

In or around 1975, after Watkins had attained his majority (and approximately six years after Fr. Durand's unwelcome conduct described above), Watkins saw Fr. Durand naked in a sauna, and reacted to the sight as though he had been shot with a "bullet to the gut." Watkins testifies that, at that time, he feared Durand because of "the experiences [he'd] had with him at the cabin."

In or around 1983, or approximately contemporaneously with the event, Watkins learned that Laughlin had been convicted of sexually abusing children in his care. Watkins later reported to his psychologist that at the time he learned of Fr. Laughlin's conviction, he told his mother he was surprised that it had been Laughlin, but "wouldn't have been surprised" had it been Fr. Durand who had been convicted. Watkins also reported to his psychologist that as additional

Page 5 - OPINION AND ORDER

newspaper accounts of sexual abuse by priests "came out over the years," he would experience strong emotional reactions.

Watkins concedes that throughout the 2000s he was aware of sex abuse claims being made against priests of the Archdiocese.

In approximately July 2005, Watkins' friend G.W., at the time a sex-abuse claimant against the defendants, contacted Watkins to inquire whether Watkins would consent to speak to G.W.'s attorney (formerly Watkins' counsel in this action) regarding the cabin weekend with Durand. Watkins agreed to do so, and did do so. Watkins subsequently reported to his psychologist that the call had "blown him away" and that his initial verbal response was "Finally!" Watkins understood that G.W. was making sex abuse claims against the Archdiocese, that his claims rested in part on the same cabin weekend with Fr. Durand at which Watkins had been present, and that it was G.W.'s theory that he was entitled to money damages because he had suffered injury in consequence of what had occurred at the cabin.

It is Watkins' position that beginning in his teenage years he repressed all memory of the alleged sexual abuse, and that he was unable to recall the unwelcome sexual touching or to understand that it had been sexually abusive until some time in 2006. Watkins does not provide evidence that any particular event or information either suddenly or gradually made it possible for him to understand that he had suffered sexual abuse. Instead, Watkins takes the position that his memory simply returned to him gradually, in "snippets," beginning some time after he spoke to G.W.'s attorney.

## III.    Relevant Procedural History

Watkins filed this action on April 22, 2011. At that time, he was represented by attorney

Page 6 - OPINION AND ORDER

Gary Bisaccio.

On April 30, 2012, Watkins produced to the defendants a 42-page report authored by his mental health expert, Randall Green, Ph.D. That report, discussed more fully below, made only passing, occasional reference to Watkins' experience of repressed or discontinuous memory, and offered no clear opinion that Watkins either repressed all memory of the sexual abuse he had experienced or that Watkins had at any time been incapable of perceiving or understanding the connection between the abuse he suffered and any consequential harm.

On May 17, 2012, attorney Randall Vogt was added as one of Watkins' attorneys of record. Bisaccio remained one of Watkins' attorneys of record at that time.

On May 30, 2012, defendants moved, *inter alia*, for summary judgment on the grounds that Watkins' claim was time-barred. In support of their motion, defendants depended in part on Green's April 2012 report.

On June 11, 2012, Bisaccio made an oral motion to withdraw as one of Watkins' attorneys of record, and the court granted the motion, noting that Vogt continued to represent Watkins. In connection with permitting Bisaccio to withdraw as counsel of record, I reset the deadlines applicable to Watkins' summary judgment response. In addition, I indicated to the parties that I would consider the possibility of re-opening discovery at oral argument on the pending dispositive motion.

On July 23, 2012, contemporaneously with his memorandum in opposition to defendants' summary judgment motion, Watkins moved to re-open discovery and to allow late disclosure of an additional expert report. Specifically, Watkins sought leave to disclose a declaration of expert opinion signed by Green on July 20, 2012. Oral argument took place on defendants' motion for

Page 7 - OPINION AND ORDER

summary judgment, Watkins' motion to re-open discovery, and Watkins' motion to allow late

expert report disclosure on August 8, 2012.

On November 19, 2012, I granted defendants' motion for summary judgment. In the

course of analyzing the factual underpinnings of the two defense theories that Watkins' claim was

time-barred – namely, that the claim was time-barred under the applicable statute of limitations

and that it was time-barred under the Claims Bar Date ordered by the bankruptcy court – I

summarized the critical issue upon which resolution of defendants' dispositive motion depended

as follows:

> Watkins' claim was timely filed under Oregon's applicable statute of limitations
> only if, in the exercise of reasonable care, Watkins could not have been expected
> to discover the causal link between the abuse he suffered and any consequential
> injury at any time prior to April 22, 2006.

I specifically found in that connection that, for purposes of defendants' dispositive motion,

Watkins had offered sufficient evidence to support the conclusion that he had repressed memory

of the complained-of abuse prior to 2006:

> I am unpersuaded by defendants' argument that, as a matter of law, Watkins has
> had actual knowledge of the sexual abuse and its harmfulness since it occurred.
> Watkins has provided competent testimony that he repressed all memory of the
> sexual abuse and of its harmfulness prior to 2006, and for purposes of defendants'
> motion I resolve all disputes regarding the accuracy of Watkins' testimony in
> Watkins' favor. For the same reason, I am unpersuaded that Watkins'
> contemporaneous knowledge of Fr. Laughlin's conviction and of sexual abuse
> claims reported in the newspaper during the 1980's was sufficient as a matter of
> law to establish that Watkins should have been aware of the substantial possibility
> that he had a potential claim against the defendants. Watkins has testified that
> memory of the abuse and its harmfulness was not triggered by any of the potential
> catalysts taking place in the 1980's.

Notwithstanding such repressed memory, however, I further found that Watkins had been placed

on inquiry notice of the possibility that he might have claims against the defendants by not later

Page 8 - OPINION AND ORDER

than July 2005:

> However, I agree with defendants that, notwithstanding the claimed repression of Watkins' memory, Watkins was placed on inquiry notice of his potential claims against the defendants by not later than July 2005. At that time, Watkins was contacted by his friend G.W., then a sex-abuse claimant against the defendants, who asked if Watkins would be willing to speak to G.W.'s attorney regarding events taking place during the cabin weekend with Durand. Watkins agreed to and did speak to G.W.'s attorney, who subsequently served as the attorney representing Watkins at the time this action was filed.
>
> At the time Watkins spoke with G.W.'s attorney, he was necessarily placed on notice that G.W. was pursuing sex abuse claims against the defendants arising out of events to which Watkins had been both a witness and a victim, much as G.W. had been. Notwithstanding any suppression of memory, Watkins' knowledge that sex abuse claims might lie against the defendants based on conduct of which he had at least potentially been a victim must necessarily have placed him on inquiry notice regarding the possibility that he, too, might have similar claims. In consequence, as a matter of Oregon law Watkins' claims against the defendants became time-barred by not later than July 2010. As noted above, Watkins filed this action in April 2011, some nine months after the applicable limitations period had closed.
>
> Because a reasonable person would have been on inquiry notice of the substantial possibility that sexual abuse claims might lie against the defendants by not later than July 2005, Watkins' claim is time-barred under the applicable statute of limitations.

On the basis of the foregoing findings, I granted summary judgment in favor of the defendants. In addition, I denied Watkins' motions to re-open discovery and to allow late disclosure of Green's purportedly supplemental declaration as moot.

## ANALYSIS

As a preliminary matter, on reconsideration I find that I committed clear error when I denied Watkins' motion (#51) to permit late disclosure of Green's purportedly supplemental declaration as moot. Because the report was material to disposition of defendants' summary judgment motion, it was improper to resolve Watkins' motion as moot based on my disposition

Page 9 - OPINION AND ORDER

of defendants' motion, rather than to resolve Watkins' motion on its merits prior to considering the merits of defendants' motion.  Pursuant to Federal Civil Procedure Rule 59(e), I therefore strike my previous disposition denying Watkins' motion as moot, and reconsider in turn the merits of both Watkins' motion (#51) to permit late disclosure of Green's July 2012 declaration and defendants' motion (#33) for summary judgment.

## I.    Watkins' Motion (#51) to Permit Untimely Disclosure of Expert Report

As noted above, on April 30, 2012, on the day of his court-ordered deadline for doing so (*see* Docket No. 14), Watkins produced to the defendants a 42-page report authored by his mental health expert, Green.  Subsequently, on July 23, 2012, expressly in response to defendants' then-pending motion for summary judgment, Watkins for the first time disclosed to defendants a further statement of opinion by Green, specifically a nine-page declaration in which Green provides responses to questions posed to him by Watkins' counsel.

Disclosure of expert testimony is governed by Federal Civil Procedure Rule 26(a)(2).
Rule 26(a)(2) provides in relevant part as follows:

> (A)    *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

> (B)    *Witnesses Who Must Provide a Written Report.* **Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case** or one whose duties as the party's employee regularly involve giving expert testimony.  The report must contain:

>> (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;

  (ii)  the facts or data considered by the witness in forming them;

  (iii)  any exhibits that will be used to summarize or support them;

  (iv)  the witness's qualifications, including a list of all publications authored in the previous 10 years;

  (v)  a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

  (vi)  a statement of the compensation to be paid for the study and testimony in the case.

   \* \* \*

 (D) *Time to Disclose Expert Testimony.* A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

  (i)  at least 90 days before the date set for trial or for the case to be ready for trial; or

  (ii)  if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

 (E) *Supplementing the Disclosure.* **The parties must supplement these disclosures when required under Rule 26(e).**

Fed. R. Civ. P. 26(a)(2) (bolded emphasis supplied).

  Regarding a party's duty to supplement expert disclosures, Federal Civil Procedure Rule 26(e)(2) provides that "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Under Federal Civil Procedure Rule 26(a)(3), pretrial disclosures are due "at least 30 days before trial,"

unless the court orders otherwise.

Federal Civil Procedure Rule 37(c) authorizes, *inter alia*, the imposition of sanctions against a party who fails to identify a witness or to provide information required under Federal Civil Procedure Rule 26(a) or (e), including in particular the exclusion sanction (except where the failure was "substantially justified" or "harmless"):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)    may inform the jury of the party's failure; and
>
> (C)    may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).[3]  In consequence, the threshold inquiry in analyzing the merits of

---

[3]  The orders listed in Federal Civil Procedure Rule 37(b)(2)(A)(i)-(vi) are as follows:

(i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)    striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part; [or]

(vi)    rendering a default judgment against the disobedient party. . . .

Watkins' motion is whether Green's declaration of July 20, 2012, disclosed for the first time to defendants on July 23, 2012 (84 days after the deadline for plaintiff's expert disclosures), was untimely for the purposes of Rule 26(a) or (e).

Analysis of Green's timely expert report of April 30, 2012, establishes that it contains only passing and occasional reference to Watkins' experience of repressed memory. Green's timely report was prepared on the basis of twelve hours of diagnostic interviews taking place in November 2011, subsequent telephonic interviews taking place in December 2011, review of Watkins' academic, legal, military, and religious records, and a battery of six psychometric tests administered on Watkins by Green. In the course of describing the reasons for Watkins' referral to him, Green states that Watkins reportedly "suffered and/or continues to suffer from" approximately thirty "traumatic reactions and/or coping mechanisms," including "denial . . . , repression, suppression, [and] traumatic amnesia. . . ."

In the course of recording his observations of Watkins' psychological state, Green states that "[Watkins] did . . . appear to have difficulty, at times, accessing his thoughts or feelings about certain prior experiences, and finding the words for them. Also, his responses were often vague and uncertain with regard to details about his past." Green further states that "Watkins . . . appears to have learned long ago to be disconnected from core thoughts and feelings. His response pattern is consistent with someone who has not been reflective or introspective with regard to internal experiences or responses to past situations."

Specifically with regard to Watkins' memory of his unwelcome experiences at the hands of Frs. Laughlin and Durand, Green states that "Watkins' memories of that which he represents to

---

Fed. R. Civ. P. 37(b)(2)(A).

Page 13 - OPINION AND ORDER

have been invasive, inappropriate contact that occasioned this civil suit are expressed in a variety

of ways, most of which are discontinuous, partial, and/or vague. He states that he has 'fuzzy

memories' about the details of either Fr. Laughlin or Fr. Durand initiating some of the

inappropriate actions and/or comments to him."

The last eight pages of Green's timely report set forth Green's conclusions in brief, cogent,

bullet-pointed paragraphs. In the course of those conclusions, Green states that "[Watkins']

presentation is such that there appears to be partial memories of his cabin trip, but they may not

represent the entirety of what took place." In addition, Green concludes that Watkins suffers

from "[c]oncentration impairment when he thinks about these matters," "[d]issociative, partial

amnesia for certain events related to the trauma experiences," and "[m]emory disruption." With

regard to memory disruption, Green concludes that "[Watkins] has significant, but fragmented

memory segments for the incidents that elicit anxiety or fear." Green does not otherwise offer

opinion or conclusion as to Watkins' experience of repressed memory. Noteworthily, Green does

not conclude or opine anywhere in his timely report that Watkins had repressed all memory of

the unwelcome experiences he suffered at the hands of Fr. Laughlin and Fr. Durand prior to any

date on or after April 22, 2006, or that Watkins was unable to understand that the unwelcome

experiences constituted sexual abuse of which he was the victim prior to any date or occurrence

taking place on or after April 22, 2006.

By contrast, in his declaration of July 2012, Green expressly declares his opinion that

Watkins "had a repressed memory of the clergy abuse which is the subject of this case," subject

to certain clarifications. Specifically, Green "attest[s] that [he] cannot say if the psychological

construct of 'repression' is the explanation for the resulting non-continuous memories of sexual

Page 14 - OPINION AND ORDER

and physical abuse by Frs. Laughlin and Durand, although it may have been involved to some degree," but further "attest[s] to [Watkins' own] report of non-continuous or recovered memories of abuse by the priests . . . and . . . to [Green's] professional opinion that the findings in [his] report [we]re consistent with" his understanding of the mechanisms underlying non-continuous or recovered memory. Green additionally declares to "scientific research literature" documenting "a significant percentage of individuals who report having experienced childhood sexual abuse" who have "had times when they did not remember the abuse experience."

    In response to questions posed by Watkins' counsel expressly regarding arguments made by the defendants in support of their then-pending motion for summary judgment, Green opines that, on the "assumption[]" (*inter alia*) that Watkins had repressed all memory of the abuse – an assumption as to the accuracy of which Green does not opine – Watkins would not necessarily have remembered the abuse on the basis of any of the mnemonic triggers proposed by the defendants. Green further declares that "[e]ven if he had remembered the childhood sexual abuse prior to G.W.'s telephone call, there is no evidence that [Green] ha[d] seen to support the conclusion that [Watkins] made a connection between what happened to him and problems he subsequently experienced related to those childhood sexual abuse acts and betrayal by the two priests." Green further declares that he "cannot agree that a reasonable person who had the same set of life experiences as a survivor with a similar history such [*sic*] to . . . Watkins' would have invariably [*sic*] recalled the abuse experiences then (again stating that recall is not synonymous with making the causal connection)."

    On the basis of the foregoing, I conclude that Green's untimely-proffered declaration of July 2012 constitutes untimely novel expert opinion rather than potentially timely

supplementation of his April 2012 report. Moreover, even on the *arguendo* assumption that the July 2012 declaration could appropriately be considered supplemental, Watkins offers no evidence or argument that Green lacked sufficient information to issue the supplemental opinion on or prior to the April 30, 2012, deadline for plaintiff's expert disclosures. Indeed, it appears that Green's July 2012 opinion is based on precisely the same diagnostic interviews, reviews of records, and psychometric tests that underlay his April 2012 report. In consequence, I conclude that the July 2012 declaration was untimely proffered under Rule 26(a) and (e). I therefore turn to Rule 37(c) to determine whether the untimeliness of the July 2012 declaration report merits the imposition of sanctions.

As noted above, sanctions are justified under Rule 37(c) in connection with untimely provided expert opinion only if the untimeliness of the opinion was neither substantially justified nor harmless. *See* Fed. R. Civ. P. 37(c)(1). Here, the evidentiary record provides no basis for the conclusion that the untimely proffer was either substantially justified or harmless. From the outset of this action, Watkins and his counsel have been aware that Watkins was proceeding on a theory of repressed memory, and were aware that defendants would oppose Watkins' claim on that issue. Watkins' failure timely to offer expert opinion as to the medical phenomena loosely referred to as repressed memory, or as to his own experience of repressed or discontinuous memory, therefore lacks substantial justification. Moreover, at minimum the untimeliness of the July 2012 declaration caused defendants to incur attorney fees by filing a dispositive motion that would have been filed in substantially different form, but for Watkins' late proffer. I therefore conclude that the untimeliness of the July 2012 declaration was not harmless. Rule 37(c) sanctions are therefore appropriate here.

Page 16 - OPINION AND ORDER

The default or "self-executing" sanction contemplated under Rule 37(c) is exclusion of the untimely proffered expert opinion. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Although other circuits have adopted the rule that the exclusion sanction is an extreme remedy "not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the [untimely proffered] evidence," *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 792 (3d Cir. 1994), the Ninth Circuit has declined to adopt any such prerequisite, *see, e.g.*, *Quevedo v. Trans-Pacific Shipping*, 143 F.3d 1255, 1258 (9th Cir. 1998), *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1061-1062 (9th Cir. 2005). Indeed, the Ninth Circuit has expressly opined that the exclusion sanction, although concededly "onerous," may be appropriately imposed under Rule 37(c) in the absence of any willfulness, fault, or bad faith on the part of the dilatory party, even where its imposition may render it difficult or impossible for that party to prove his or her case. *Yeti by Molly*, 259 F.3d at 1106. I see no compelling grounds for deviation from the default, self-executing Rule 37(c) exclusion sanction here.

For the foregoing reasons, on reconsideration Watkins' motion (#51) to permit untimely disclosure of expert witness opinion is denied on its merits.

## II.     Defendants' Motion (#33) for Summary Judgment

Watkins asserts that I improvidently granted defendants' motion for summary judgment, and argues for reconsideration under both Federal Civil Procedure Rule 59(e) and Federal Civil Procedure Rule 60(b). I consider Watkins' arguments in connection with both Rules below. As a preliminary matter, however, I first note that in my Opinion and Order (#74) dated November 19, 2012, I found that Watkins' claim was timely filed under Oregon's applicable statute of

limitations only if, in the exercise of reasonable care, Watkins could not have been expected to discover the causal link between the abuse he suffered and any consequential injury at any time prior to April 22, 2006. Watkins does not now challenge that finding. For all of the reasons stated in my previous opinion, I now affirm for purposes of Watkins' motion for reconsideration that defendants' burden at summary judgment was to establish that in the exercise of reasonable care, a person situated similarly to Watkins should have discovered both that he had suffered abuse and the causal link between that abuse and any consequential injury prior to April 22, 2006.

A.      Amendment of Judgment Under Rule 59(e)

In support of his motion for reconsideration pursuant to Federal Civil Procedure Rule 59(e), Watkins argues that I committed two clear errors of law and that summary judgment in defendants' favor was, independently of those errors, manifestly unjust. Watkins' assignments of error are that I erroneously placed the burden of proof at summary judgment burden on the (nonmoving) plaintiff rather than appropriately on the (moving) defendants, and that I erroneously disregarded Watkins' allegations of repressed memory in concluding that by not later than July 2005 Watkins in the exercise of reasonable care should have known facts which would have made a reasonable person similarly situated aware of a substantial possibility that each of the elements of his sexual battery of a child claim was satisfied. Watkins asserts manifest injustice in my decision to grant summary judgment on the basis of the absence of any material factual dispute as to whether Watkins was capable of conducting reasonable inquiry into the possibility that he might have a claim against the defendants, where he purportedly would have been able to create a dispute of fact on that question had I not improperly failed to consider

Page 18 - OPINION AND ORDER

Green's July 2012 declaration. I address each set of arguments below.

### 1.   Manifest Injustice

I agree with Watkins that justice requires consideration of his motion to permit untimely disclosure of expert opinion prior to resolution of defendants' motion for summary judgment, and that I failed to consider his motion before resolving defendants' dispositive motion in my Opinion and Order of November 19, 2012. However, on reconsideration, *supra*, I have denied Watkins' motion to permit untimely disclosure of expert opinion on its merits. In consequence, the manifest injustice Watkins identifies has been avoided, and I decline to disturb my prior disposition on that basis.

### 2.   Burden of Proof at Summary Judgment

Watkins argues that I clearly erred in granting summary judgment in defendants' favor by requiring Watkins to shoulder the burden of proof on defendants' motion. Watkins does not argue that I did so expressly, as indeed I did not, but rather argues that I did so tacitly, by ruling despite the fact that the defendants "introduced no evidence that a reasonable person in plaintiff's circumstances would have conducted an inquiry in July of 2005 [or] evidence of what that inquiry would have produced."

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). Thus, a moving party's burden at summary judgment is not to produce evidence sufficient to refute all logically possible grounds upon which an opposing party could resist judgment, but rather to establish entitlement to judgment as a matter of law where all reasonable inferences from the evidence of record are drawn in favor of the opposing party.

Moreover, although under Oregon law the question of when a person in the exercise of reasonable care should have discovered an injury or the causal connection between an injury and a tortfeasor's conduct is generally a question of fact for a jury to decide, *see Minisce v. Thompson,* 149 Or. App. 746, 752 (1997), a court may grant summary judgment notwithstanding a question of reasonableness "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," because under those circumstances "there is no 'genuine issue for trial'." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

As will be discussed more fully below, on reconsideration I am satisfied that defendants have established their entitlement to summary judgment on Watkins' claim under the appropriate governing legal standard. In consequence, I decline to disturb my prior disposition on the proffered ground that I erroneously shifted the burden of proof onto Watkins.

### 3.    Untimeliness of Watkins' Claim

The unwelcome experiences Watkins suffered at the hands of Frs. Laughlin and Durand

took place during the period from 1965 to 1969, when Watkins was ten to fourteen years old.

During the period immediately following those experiences, Watkins attempted to discuss what

had happened with other boys who had been present at the cabin weekend and with his mother,

but felt rebuffed by the responses his overtures received. It is Watkins' position that prior to

attaining his majority he subsequently repressed all memory of the unwelcome experiences. It is

Watkins' further position that once his memory began to return "in snippets" beginning in July

2005, he remained unable to understand the causal connection between those experiences and his

consequent psychological and/or socio-emotional harm until some time in 2007 or 2008.

The undisputed evidence of record[4] establishes that prior to 2005 Watkins' repressed

memory of the priests' abusive conduct toward him was not altogether complete. As noted

above, in approximately 1975, when Watkins was approximately twenty years old, Watkins

unexpectedly encountered Fr. Durand naked in a sauna, and reacted to the sight as though he had

been shot with a "bullet to the gut." Watkins provided testimony that, at that time, he feared

Durand because of "the experiences [he'd] had with him at the cabin."

Also as noted above, when Watkins learned in approximately 1983 that Fr. Laughlin had

been convicted of sexually abusing children in his care, he told his mother that he was surprised

that it had been Laughlin, but "wouldn't have been surprised" had it been Fr. Durand who had

been convicted. In addition, Watkins was fully aware of experiencing strong emotional

_____

[4] Much of the material evidence of record is drawn from Green's timely report of April
2012. To the extent that report contains statements made by Watkins, those statements are not
hearsay pursuant to Federal Evidence Rule 801(d)(2) (and would in any event be subject to an
exception to the rule against hearsay pursuant to Federal Evidence Rule 803(4)), and Green's
report of those statements are subject to an exception to the rule against hearsay pursuant to
Federal Evidence Rule 803(6).

Page 21 - OPINION AND ORDER

responses when reading newspaper accounts of subsequent disclosures of sexual abuse by priests of the Archdiocese.

In July 2005, Watkins was contacted by his friend G.W. in connection with G.W.'s sex abuse claims against the defendants. Watkins understood at that time that G.W.'s claims arose in part out of events taking place at the cabin weekend with Fr. Durand, and that he himself had been present during that weekend. Watkins further understood that G.W. wanted Watkins to discuss his recollection of events taking place during the cabin weekend with G.W.'s attorney. Watkins subsequently reported to his psychologist that his "initial reaction internally" when he received the call and discussed the cabin weekend with G.W. in July 1975 "was, 'Finally!'" and that he "was 'blown away.'"

Watkins later reported to his psychologist that G.W. had been "trying to identify others who were there." Watkins reported that G.W. told him that "the guys he remembered were there said they didn't remember or have a recollection." Watkins reported to his psychologist that when he heard in July 2005 about G.W.'s difficulties in finding witnesses he had the following response:

> It really hurt me. . . . I thought, come on! It is not unlike when I tried to talk with them and got no response. That is scary! I know it happened! It is hard to deal with it. When I have space, when I get away from it, I give it too much free rent in my brain. Right now [in 2011], I can't put it away.

Approximately contemporaneously with his discussion with G.W., Watkins "shared" with his sisters that he had been contacted regarding the sex abuse suffered by his former classmate. Watkins reported to his psychologist that he was vague with his sisters and deliberately "downplayed" it, but did tell them about Fr. Durand rubbing snow on his genitals during the

cabin weekend.  Watkins reported to his psychologist that he did not speak with his sisters again about the subject until 2011.

On January 4, 2007, Watkins signed an affidavit for use in G.W.'s lawsuit.  In his affidavit, Watkins related substantially all of the unwelcome conduct described above as having taken place over the course of the cabin weekend.  According to Watkins' testimony, he signed the affidavit prior to undergoing any form of therapy in connection with his recovered memory. Watkins subsequently reported to his therapist that signing the affidavit caused him to feel a degree of relief from anxiety, and to think to himself, "Someone finally believe[s] me."

Thus, by Watkins' own account, in July 2005 he understood that G.W. had experienced actionable sex abuse at the hands of Fr. Durand during the 1969 cabin weekend, and, indeed, thought in 2005 that a lawsuit against Fr. Durand arising out of the events of that weekend was sufficiently overdue to merit the response "Finally!"  Also by Watkins' own account, in July 2005 he remembered at minimum some of the unwelcome sexual touching he suffered at Fr. Durand's hands, namely the experience of Fr. Durand rubbing snow on his genitals.  Also by Watkins' own account, in July 2005 he "kn[e]w it happened" and was "hurt" by the failure of other men who had been present to recollect (or admit to recollection of) the priest's abusive conduct.

In addition, the record establishes that Watkins' memory of the abuse he suffered was, by not later than January 4, 2007, substantially as complete as it was on the day he filed his complaint in this action.  Although that date is subsequent to the critical date of April 22, 2006, by Watkins' own account the act of signing the January 2007 affidavit caused him to experience relief from anxiety and to harbor the thought that "[s]omeone finally believed [him]," strongly suggesting that for some considerable period prior to that date, Watkins understood that

something significant had happened to him during the 1969 cabin weekend.

Under all of the foredescribed circumstances, a reasonable person – including a reasonable person with only incomplete or partial memories of the 1969 cabin weekend – in the exercise of reasonable care would, prior to April 22, 2006, have either understood that he had a potential claim against the defendants or would have had good reason to make further inquiry into that possibility.  Watkins understood in July 2005 that he had experienced at least some unwelcome sexual touching during the cabin weekend, and that the sexual touching G.W. had experienced during the same cabin weekend was actionable.  In addition, Watkins had at that time long been aware that his emotional responses to revelations of sexual abuse by priests were noteworthily strong, and that he had harbored an intense personal aversion to Fr. Durand for the entirety of his adult life.

That Watkins may not have been aware in July 2005 of all of the unwelcome sexual touching he experienced at the hands of Frs. Laughlin and Durand does not impact the foregoing conclusion.  The statute of limitations begins to run when a potential claimant is aware of the substantial possibility that a claim may lie, and not when the claimant learns the full extent of consequential damages.  *See, e.g., Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or. 151, 165 (1987).

No rational trier of fact could conclude on the foredescribed facts that, had Watkins made reasonable inquiry regarding the possibility that he might have a claim against the defendants, he would not have learned of the substantial possibility that a sex abuse claim might lie. Reasonable inquiry would have established that a man with a history of depression who was sexually touched by a priest while still a minor and who thereafter felt intense personal aversion

to the priest who had touched him is substantially likely to have a claim against the priest or the

priest's employers.

For the foregoing reasons, I affirm my prior finding that prior to April 22, 2006, Watkins

knew or should have known facts giving rise to a substantial possibility that the elements of his

claim against the defendants were satisfied.  Moreover, the same conclusion would obtain had

Green's July 2012 declaration been timely disclosed to the defendants.  Green's key opinion

testimony in that declaration is in connection with Watkins' capacity to perceive and understand

the causal connection between the abuse he suffered at the hands of defendants' priests and the

harm he suffered in consequence.  In that connection, Green offered the following opinion

testimony:

- "I do not think it is necessarily the case that any of [certain enumerated] stimuli [not

    including, *inter alia*, Watkins' July 2005 recollection of Fr. Durand rubbing snow on his

    genitals or his July 2005 experience of hurt feelings that other witnesses claimed not to

    recall the abuse] would inevitably be necessary conditions for . . . Watkins[] to directly

    insert himself into his prior experiences of childhood sexual abuse."

- "Even if he had remembered the childhood sexual abuse prior to G.W.'s telephone call,

    there is no evidence that I have seen to support the conclusion that he made a connection

    between what happened to him and problems he subsequently experienced related to

    those childhood sexual abuse acts and betrayal by the two priests. . . . I did not find

    information in the record to support the conclusion that he had made the connection."

- "I cannot agree that a reasonable person who had the same set of life experiences as a

    survivor with a similar history such [*sic*] to . . . Watkins[] would have invariably [*sic*]

Page 25 - OPINION AND ORDER

recalled the abuse experiences then (again stating that recall is not synonymous with making the causal connection)."

Green does not purport to opine that Watkins was incapable on or prior to April 22, 2006, of understanding the causal connection between his experiences and his consequential harm. Instead, Green opines that a limited subset of Watkins' reported experiences would not inevitably have caused Watkins to "directly insert himself into his prior experiences," that Green has not seen that Watkins actually did "ma[k]e a connection" between his experiences and his harm, and that he "cannot agree" that Watkins would "invariably" have recalled his abuse based on his reported experiences subsequent thereto. None of these opinions is on all fours with, and none negate, the controlling legal conclusion that prior to April 22, 2006, Watkins knew *or reasonably should have known* facts giving rise to *a substantial possibility* that the elements of his claim against the defendants were satisfied, including the substantial possibility (not certainty) that he had suffered some cognizable harm in consequence of his experiences (which, by his own account, he had at least some recollection of by not later than July 2005).

For the foregoing reasons, I decline to disturb my prior disposition on the proffered ground that I erroneously found Watkins' claim untimely.

**B.      Relief From Final Judgment Under Rule 60(b)**

In support of his motion for reconsideration pursuant to Federal Civil Procedure Rule 60(b), Watkins argues that the same two assignments of clear error discussed above constitute "mistake" warranting relief from judgment, and additionally argues that relief from judgment is justified due to "extraordinary circumstances," namely the purported gross negligence of his prior attorney, Bisaccio, purportedly amounting to virtual abandonment of Watkins' case. For the

same reasons discussed above, I disagree with Watkins' assignments of error in my allocation of

the burden of proof at summary judgment and in my finding that Watkins' claim was untimely

filed, and decline to relieve Watkins from judgment on those proffered grounds.

As to Watkins' argument that Bisaccio's purported gross negligence warrants relief from

judgment in this matter, I agree that an attorney's gross negligence amounting to virtual

abandonment of a client's claims is sufficient under Rule 60(b) to warrant relief from default

judgment or from judgment of dismissal for failure to prosecute:

> An attorney's actions are typically chargeable to his or her client and do not
> ordinarily constitute extraordinary circumstances warranting relief from judgment
> under Rule 60(b)(6). *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34, 82 S.
> Ct. 1386, 8 L. Ed. 2d 734 (1962); *Ringgold Corp. v. Worrall*, 880 F.2d 1138,
> 1141-42 (9th Cir. 1989). But there are exceptions to this general principle. In
> *Community Dental Services v. Tani*, 282 F.3d 1164 (9th Cir. 2002), we joined the
> Third, Sixth and Federal Circuits in holding that an attorney's gross negligence
> constitutes such an extraordinary circumstance. We followed the Third Circuit in
> defining gross negligence as "neglect so gross that it is inexcusable." *Id.* at 1168
> (*quoting Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 978 (3d
> Cir. 1978)).
>
> The attorney in *Tani* "virtually abandoned his client by failing to proceed with his
> client's defense despite court orders to do so" and deliberately deceived his client
> about what he was doing (or not doing). *Id.* at 1170-71. The district court issued
> a default judgment. When Tani learned of the default judgment, he promptly
> hired a new attorney and filed a motion for relief from the default judgment under
> Rule 60(b)(6). *Id.* at 1167. The district court denied the motion.
>
> We held that the behavior of Tani's first attorney constituted gross negligence and
> that the district court abused its discretion in refusing to grant Tani relief under
> Rule 60(b)(6). We wrote, "Conduct on the part of a client's alleged representative
> that results in the client's receiving practically no representation at all clearly
> constitutes gross negligence, and vitiat[es] the agency relationship that underlies
> our general policy of attributing to the client the acts of his attorney." *Id.* at 1171.
>
> We apply *Tani* to this case and hold that an attorney's gross negligence resulting in
> dismissal with prejudice for failure to prosecute constitutes an "extraordinary
> circumstance" under Rule 60(b)(6) warranting relief from judgment. Dismissal

with prejudice under Rule 41(b) for failure to prosecute is the converse of a default judgment.  In both instances, the consequence of the attorney's action (or inaction) is a loss of the case on the merits.  The only significant difference is that the plaintiff rather than the defendant suffers the adverse judgment.

Our holding is consistent with *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097 (9th Cir. 2006).  The plaintiff-appellant in *Latshaw* requested Rule 60(b)(6) relief from a judgment resulting from her acceptance of an offer of judgment under Federal Rule of Civil Procedure 68.  *Id.* at 1102-03.  She stated that she accepted the offer based on her attorney's coercion and erroneous legal advice, and she argued that his conduct constituted gross negligence meriting Rule 60(b)(6) relief.  *Id.*  **We distinguished default judgments, which are disfavored, from Rule 68 judgments, which are "actively supported" by courts.**  *Id.* at 1103. **We therefore declined to extend *Tani* to allow relief from judgments entered under Rule 68, holding that the plaintiff-appellant's attorney's conduct, even if grossly negligent, did not constitute grounds for Rule 60(b)(6) relief.**

A dismissal for failure to prosecute under Rule 41(b) is much more like a default judgment than a Rule 68 judgment.  We based our decision in *Tani* on "the well-established policy considerations we have recognized as underlying default judgments and Rule 60(b)."  *Tani*, 282 F.3d at 1169.  The same policy considerations underlie dismissal for failure to prosecute.  We have stated that dismissal under Rule 41(b) "is so harsh a penalty it should be imposed as a sanction only in extreme circumstances."  *Dahl v. City of Huntington Beach*, 84 F.3d 363, 366 (9th Cir. 1996).  This is almost identical to our stance on default judgments, which are "appropriate only in extreme circumstances."  *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984) *(per curiam)*.

It is obvious that the conduct of Lal's attorney [Spahr] constituted gross negligence.  The facts recounted in Lal's sworn statement are not disputed.  The similarities between the attorney's conduct in *Tani* and Spahr's conduct in this case are striking.  First, both attorneys "virtually abandoned their clients by failing to proceed with their clients' case despite court orders to do so."  *Tani*, 282 F.3d at 1170.  The attorney in *Tani* filed the answer late and never provided plaintiffs with a copy.  He "failed to contact plaintiff for preliminary settlement discussions despite being ordered to do so, failed to oppose plaintiff's motion to strike the answer, and failed to attend various hearings."  *Id.* at 1171.  Spahr failed to make initial Rule 26 disclosures after being ordered to do so; failed to meet, confer, and participate in the joint case management conference after being ordered to do so; and failed to attend hearings.

Second, both the attorney in *Tani* and Spahr "deliberately misled [heir clients and deprived them of the opportunity to take action to preserve their rights."  *Id.*

Page 28 - OPINION AND ORDER

> Tani's attorney "explicitly represented to Tani that the case was proceeding
> properly." *Id.* Tani only learned of the default judgment against him when the
> judgment was mailed to his office. *Id.* at 1167. Similarly, Spahr continued to tell
> Lal that her case was moving forward even after it had been dismissed. In
> mid-December 2006, Spahr told Lal that the next meeting on her case would be in
> two to three months, even though the case management conference was scheduled
> for January 18, 2007. Although the district court had dismissed Lal's action for
> failure to prosecute on February 2, 2007, Spahr told her in March that Defendants
> needed more time for discovery. On September 21, 2007, Spahr lied to Lal,
> telling her he had scheduled depositions in her case for November. On October 1,
> Spahr told Lal that he had re-filed her suit in state court. On October 12, Spahr
> told Lal he was filing a "pre-hearing motion" in her case. Throughout October,
> Spahr repeatedly assured Lal that he would give her copies of all of the documents
> he falsely claimed to have filed in her case. In these circumstances, we hold that
> Spahr acted with gross negligence and that Lal has demonstrated "extraordinary
> circumstances" beyond her control that merit relief under Rule 60(b)(6).

*Lal v. California*, 610 F.3d 518, 524-526 (9th Cir. 2010) (internal modification omitted;

emphasis supplied). I am aware, however, of no case in which similar gross negligence has been

held to warrant relief from a judgment that issued following consideration of the merits. Indeed,

it appears highly probable that the Ninth Circuit would reject the theory that Rule 60(b) can

afford relief from judgment under such circumstances. *See Latshaw v. Trainer Wortham & Co.,*

*Inc.*, 452 F.3d 1097, 1102-1103 (9th Cir. 2006).

Moreover, assuming *arguendo* that relief is even potentially available to Watkins under

Rule 60(b) on his theory of gross attorney negligence, it is well established that "[a] party moving

for relief under Rule 60(b)(6) 'must demonstrate both injury and circumstances beyond his

control that prevented him from proceeding with the action in a proper fashion.'" *Harvest v.*

*Castro*, 531 F.3d 737, 749 (9th Cir. 2008), *quoting Latshaw v. Trainer Wortham & Co., Inc.*, 452

F.3d 1097, 1103 (9th Cir. 2006). The Ninth Circuit has specified that Rule 60(b)(6) "is to be

'used sparingly as an equitable remedy to prevent manifest injustice and is to be utilized only

Page 29 - OPINION AND ORDER

where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.'" *Id.*, *quoting Latshaw*, 452 F.3d at 1103, *quoting United States v. Washington*, 394 F.3d 1152, 1157 (9th Cir. 2005). Even on an *arguendo* assumption that Rule 60(b) is applicable under the circumstances, Watkins' motion fails both for lack of demonstrated injury and absence of circumstances preventing him from taking timely action to prevent erroneous judgment.

As a preliminary matter, I disagree with Watkins' characterization of Bisaccio's representation as constituting virtual abandonment of Watkins' case. Both Bisaccio and his later-added co-counsel (and still later replacement counsel) Vogt represented Watkins on an ongoing, continuous basis during the course of these proceedings, appearing at hearings and depositions, and responding on Watkins' behalf to defendants' motions and communications. While I do not opine as to the diligence or quality of either attorney's representation, I do find that neither attorney abandoned or virtually abandoned either Watkins or this action prior to withdrawal.

As to demonstrated injury, I note that Watkins has identified no piece or body of evidence that might have been offered (but was not) to rebut the evidence of record discussed above that I have found sufficient to establish that Watkins' claim is time-barred. In the absence of any such particular failure on the part of his counsel, Watkins cannot establish a demonstrated injury flowing from the grossly negligent quality of their representation.

As to extraordinary circumstances preventing Watkins from avoiding erroneous judgment, I note that Watkins has not established that judgment in defendants' favor was erroneous. To the contrary, for the reasons discussed above, defendants would have been entitled to summary judgment even if Green's untimely disclosed July 2012 declaration had been

Page 30 - OPINION AND ORDER

considered.

For the foregoing reasons, I decline to relieve Watkins from judgment on the proffered ground of his counsel's purported gross negligence.

## CONCLUSION

For the reasons set forth above, Watkins' motion (#86) for reconsideration is granted in part and denied in part as discussed above, on reconsideration Watkins' motion (#51) to permit untimely disclosure of expert opinion is denied on its merits, on reconsideration defendants' motion (#33) for summary judgment is granted, and on reconsideration final judgment (#75) in this matter dismissing Watkins' claim with prejudice is affirmed.

Dated this 14th day of May, 2013.

Honorable Paul Papak
United States Magistrate Judge